[Cite as *Gerschutz v. Med. College of Ohio Hosp.*, 2009-Ohio-6072.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us


MELINDA F. GERSCHUTZ, et al.

    Plaintiffs

    v.

MEDICAL COLLEGE OF OHIO HOSPITAL

    Defendant
    Case No. 2003-04783

Judge Joseph T. Clark

DECISION


{¶ 1}  Plaintiff, Melinda Gerschutz, brought this action against defendant, Medical College of Ohio (MCO),[1] alleging medical negligence.  Plaintiff's husband, Joseph, also filed a claim for loss of consortium.  The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2}  Plaintiff[2] testified that she was diagnosed with rheumatoid arthritis (RA) in 1999, and that she also suffers from vertigo caused by an insufficient blood flow to her brain that results in bouts of dizziness.  She testified that she was referred by her family physician to Dr. Lindamood for treatment of her RA and that for the next two years he repeatedly administered steroid injections and oral steroid medications in an effort to control her symptoms of pain and swelling in her joints, including her hands, fingers, wrists, knees, ankles, and feet.  At times, her elbows, shoulders and back were also symptomatic.  In 2001, plaintiff complained that she was not improving and that, in fact,

---

[1]MCO is now known as the University of Toledo.

she was getting worse.  Her family physician referred her to Dr. Kahaleh at MCO.  At the initial visit in March 2001, Dr. Kahaleh confirmed that plaintiff suffered from RA and he also diagnosed her with fibromyalgia.

{¶ 3}   In June 2001, plaintiff authored a letter to Dr. Kahaleh in order to provide him with enough background information to enlist his support for her claim for ongoing long-term disability.  In the letter, plaintiff stated that  "I do not do any outside activities or things with my kids or even the house work like I use to do.  My hands swell all the time.  I drop things a lot; I can't lift due to the weakness or pull.  If I stand very long I swell at the knees and feet.  * * * I try to do different things like riding an exercise bike even for short times but I end up on crutches [every] time.   * * * I can't even set in one position to long or I swell and hurt really bad."  (Joint Exhibit 1, Page 29.)  Dr. Kahaleh treated plaintiff throughout the summer with a series of anti-inflammatory injections, pain medications, and he directed her to participate in aquatic therapy as a form of exercise.  According to the medical records, plaintiff participated in the aquatic exercise program once, on July 17, 2001; however, she did not continue the program due to complaints of severe pain.  (Joint Exhibit 1, Page 35.)

{¶ 4}   Plaintiff testified that she fell at home on October 18, 2001, that she had heard a popping sound as she was falling, that she immediately experienced severe pain from her right hip to below her knee, and that she was unable to move her leg.  According to plaintiff, she asked her husband to call Dr. Kahaleh and that after he spoke with someone at the doctor's office, Joseph then carried her to their truck and drove her to Dr. Kahaleh's office, a 45 to 50-minute trip.  Plaintiff recalled that her husband went into the office building, procured a wheelchair, and helped transport her to the waiting area.

{¶ 5}  Plaintiff also testified that she informed the medical student and Dr. Kahaleh about the fall at home and the resulting pain involving her right hip and knee.  She stated that she had been experiencing increased swelling in her knee for the past ten days and that the knee "gave out" and that is why she fell.  After she had been examined, plaintiff was informed by Dr. Kahaleh that she was suffering from both trochanteric bursitis and  possibly a meniscal tear of the knee.  Plaintiff recalled that Dr.

---

[2]The term "plaintiff" shall be used to refer to Melinda Gerschutz throughout this decision.

Kahaleh injected medication into her right hip and knee for relief of the pain and swelling. Plaintiff returned to see Dr. Kahaleh in approximately two weeks and stated that the injections were not helping. Dr. Kahaleh scheduled an MRI in order to determine whether she had suffered a meniscal tear of her knee. Dr. Kahaleh also referred her to an orthopedic surgeon, Dr. Goitz, for a consultation.

{¶ 6} Plaintiff testified that during the initial appointment with Dr. Goitz, she explained to him that she had fallen prior to the appointment and that since then she had suffered pain in her whole leg and that the pain would increase upon certain movements. Plaintiff testified that this fall was different from the earlier fall in that this time she had been using crutches to get in and out of the wheelchair and that she had merely lost her balance and fallen back into the wheelchair. According to plaintiff, Dr. Goitz confirmed the diagnosis of bursitis and told her that the MRI was negative for a meniscal tear. Dr. Goitz expressed concern about the weakness in her right leg and he recommended that plaintiff undergo physical therapy to strengthen her knee.

{¶ 7} Plaintiff testified that after a few weeks, the physical therapist advised her that she was not improving and in fact she was getting worse. Plaintiff returned to Dr. Goitz's office on December 31, 2001, and he again recommended she attend physical therapy, this time from a different service provider. Plaintiff testified that she attended a few sessions but that she was unable to bear the pain that resulted from exercising her right leg. According to plaintiff, at the next appointment with Dr. Goitz on April 24, 2002, she complained of constant hip and knee pain that she described as shooting pain up and down between her hip and knee. Dr. Goitz eventually suggested plaintiff undergo arthroscopic surgery on her knee and plaintiff had the surgery on April 30, 2002. Plaintiff acknowledged that she attained some improvement in the pain and swelling of her knee but that she was unable to complete postoperative physical therapy sessions due to severe pain, most notably in her hip. According to plaintiff, the pain was so debilitating that she also missed several scheduled appointments with Dr. Goitz during the summer.

{¶ 8} Plaintiff testified that on September 5, 2002, she had a follow-up appointment with Dr. Kahaleh, and that she complained of severe right hip pain and lower extremity swelling. Dr. Kahaleh sent plaintiff for an x-ray of her hip that same day.

After the x-rays were taken, plaintiff was informed that her right hip was fractured, and she was transported by wheelchair to the orthopedic clinic for a consult with another orthopedic surgeon, Dr. Georgiadis. Plaintiff stated that Dr. Georgiadis showed her the x-rays and informed her that based upon the x-rays, the fracture was not recent. He advised that she would need surgery and possibly a total hip replacement. Plaintiff testified that she was shocked and overwhelmed and that she was unsure how to proceed. According to plaintiff, she sought another opinion but she was not satisfied with the surgical approach that was suggested.

{¶ 9} Plaintiff recalled that on one particular day after she had experienced an episode of increased pain, she asked her husband to take her to the emergency room at the Cleveland Clinic.[3] The Cleveland Clinic physicians also took x-rays of plaintiff's hip and confirmed that she needed to have the fracture repaired surgically. While there, she was referred to an orthopedic surgeon, Dr. Muschler, and he eventually performed the initial surgery to repair the fracture. Plaintiff testified that she has endured multiple hip surgeries since that time, and that she continues to be treated by Dr. Muschler.

{¶ 10} Plaintiff contends that the fracture occurred on October 18, 2001, and that both Drs. Kahaleh and Goitz were negligent in failing to accurately and timely diagnose her condition.

{¶ 11} Defendant denies liability and contends that plaintiff created her version of events only after the fracture was diagnosed and that the medical records do not support plaintiff's testimony and recollections. In addition, defendant maintains that the treatment rendered by Drs. Kahaleh and Goitz did not fall below the standard of care for rheumatologists and orthopedic surgeons, respectively.

{¶ 12} Dr. Kahaleh testified that he is board-certified in internal medicine and rheumatology. He explained that rheumatologists treat chronic disabling conditions that affect either bones or joints. He defined RA as an autoimmune disorder which manifests as a systemic inflammatory process that attacks the joints. Although RA starts out in the small joints of the hands and feet, Dr. Kahaleh stated that it can become widespread and affect shoulders, hips, and knees. According to the medical records, plaintiff sought treatment from Dr. Kahaleh in March 2001 with complaints of

constant pain and swelling in her hands, ankles, feet, neck, and back. Dr. Kahaleh testified that RA does not usually manifest itself in the back, and that after he performed a thorough examination, he diagnosed plaintiff with fibromyalgia as well.

{¶ 13} In the portion of the October 18, 2001medical record that documents plaintiff's chief complaint ("cc"), it states that she was there both for an RA and fibromyalgia checkup and a medication refill. (Joint Exhibit 1, Page 58.) In reference to this appointment, Dr. Kahaleh testified that the medical records verify that this was a routine follow-up appointment that had been scheduled in September. Dr. Kahaleh insisted that plaintiff did not report a fall to him or to the medical student on that day and that had she done so, such event would have been noted in the medical records.[4] Dr. Kahaleh also testified that had plaintiff informed him that she had fallen, that she heard a popping noise, and that she was in severe pain from the fall, he would have sent her to the emergency room for treatment of the acute trauma.

{¶ 14} According to the record, plaintiff reported that her right hip, thigh, and knee were swollen and painful, red and warm for the past ten days. She explained that she was using crutches intermittently and that both walking and inactivity made her symptoms worse. Upon examination, the medical student was able to elicit pain in the posterior region of plaintiff's right knee and the lateral area of her right hip. Dr. Kahaleh's note reiterates that plaintiff complained of severe right knee and hip pain for the past two weeks, and his examination confirmed that plaintiff's right knee was "very painful." (Joint Exhibit 1, Page 59.) Dr. Kahaleh determined that plaintiff was suffering from trochanteric bursitis and that possibly she had a tear of the meniscus of her right knee. According to his notes, Dr. Kahaleh interpreted plaintiff's complaints to be focused more on her knee pain than on her hip discomfort. He ordered an MRI of the knee and injected anti-inflammatory medications into the hip and knee areas.

{¶ 15} When plaintiff returned for a follow-up visit on November 1, 2001, the MRI had not been done yet, and Dr. Kahaleh referred plaintiff to the orthopedics clinic for a consultation with Dr. Goitz. According to Dr. Kahaleh, plaintiff continued to emphasize

---

[3]The medical records document that this event took place on September 13, 2002. (Joint Exhibit 1, Page 201.)

[4]It is undisputed that there is no mention of a fall or recent traumatic event in the October 18, 2001 notes made by the medical assistant, the medical student or Dr. Kahaleh.

the knee pain over other discomforts. Indeed, plaintiff's subjective complaints were substantiated in that the MRI did identify some degenerative changes and fluid buildup within the right knee joint, and a Baker's cyst in the back of plaintiff's knee. Dr. Kahaleh stated that on February 5, 2002, he again examined plaintiff and noted that she continued to have right hip pain. At that time, plaintiff reported that she was participating in physical therapy and that she ambulated with the assistance of crutches. Dr. Kahaleh testified that plaintiff's physical examination also revealed that she had weakness in her right hip which he attributed to the ongoing knee pain and her limited activity due to such pain. He again administered an injection into the right trochanteric bursa area in an effort to relieve plaintiff's symptoms.

{¶ 16} Dr. Kahaleh noted that when plaintiff came to his office on September 5, 2002, she was complaining primarily of severe right hip pain. The medical records note that plaintiff exhibited "pain on palpation of [the anterior right] hip over [the] inguinal ligament." (Joint Exhibit 1, Page 190.) He testified that he ordered her to be sent for a hip x-ray as this was the very first time that plaintiff's complaints were focused primarily on her hip and not her knee. He testified that prior to this appointment, he had no reason to suspect that she had fractured her hip.

{¶ 17} Dr. Goitz testified that he is board-certified in orthopedic surgery. In reviewing the medical records, he noted that plaintiff was seen on November 21, 2001, as a referral from Dr. Kahaleh. Plaintiff presented with a one-month history of right knee pain. The physical examination notes read as follows.

{¶ 18} "She denies any injury to her knee. She describes anterior and posterior knee pain. She denies any lateral or medial tenderness. She states that she was able to ambulate with crutches when the pain started, but that she fell four days ago and now the pain and swelling makes her wheelchair bound. She also complains of right shoulder and left lower extremity swelling as well, especially since the crutches.

{¶ 19} "She has exquisite pain over the medial aspects of the tibial tubercle. She is mildly tender to palpation over the hamstrings. There is mild joint line tenderness, especially laterally." (Joint Exhibit 1, Page 77.)

{¶ 20} As a result of these findings and his physical examination, Dr. Goitz diagnosed plaintiff with right patellar tendonitis, he recommended physical therapy, and

he suggested that she be seen again in approximately six months for followup. Dr. Goitz testified that had plaintiff's hip fracture occurred prior to his examination, plaintiff would have experienced exquisite right hip and severe groin pain during his manipulations of her right leg. According to Dr. Goitz, the medical records document exquisite pain near the knee at the medial aspect of the tibial tubercle, and that the MRI confirmed the presence of a Baker's cyst, both findings that were consistent with pathology involving the knee. Dr. Goitz stated that physical therapy was the proper treatment for patellar tendonitis and that he would have expected to see improvement in plaintiff's symptoms within one month.

{¶ 21} Dr. Goitz next evaluated plaintiff on December 31, 2001. At this appointment, plaintiff reported that she continued to experience right knee pain and that both the pain and weakness limited her ability to walk more than 10-15 steps at a time. Plaintiff also reported that she had not achieved any improvement with physical therapy and that she used a wheelchair for most activities. (Joint Exhibit 1, Page 93.) During the physical examination, Dr. Goitz noted that plaintiff was unable to raise her affected limb off of the exam table. Dr. Goitz testified that based upon both the history presented by plaintiff and his examination that day, he concluded that plaintiff was suffering from persistent patellar tendonitis. He recommended that she try another course of physical therapy from a different therapist. He testified that his plan was to have plaintiff increase the strength of her right leg and resolve her knee pain.

{¶ 22} According to the medical records, after plaintiff missed a few appointments she again saw Dr. Goitz on April 24, 2002. At that time, she stated that her knee pain had improved and that she was able to bear weight on her right leg. Plaintiff complained of right hip pain that she attributed to her RA and that she characterized as a flare-up of a chronic condition. (Joint Exhibit 1, Page 117.) Although her lower extremity strength had improved and she could now lift her leg off the table, plaintiff still exhibited swelling and pain upon palpation of the medial aspect of her right knee. Inasmuch as plaintiff had reached a plateau with physical therapy, Dr. Goitz recommended that plaintiff undergo arthroscopic surgery in order to visualize inside the knee to ascertain whether or not she had suffered a true meniscal tear and to remove any inflamed tissue inside the knee joint. Dr. Goitz performed the procedure on April

30, 2002, during which he removed thickened portions of tissue and smoothed the joint surfaces. Dr. Goitz did not recall whether he treated plaintiff again prior to the fractured hip being diagnosed in September 2002, and the medical records are inconclusive.

{¶ 23} Upon cross-examination, Dr. Goitz testified that he never had reason to suspect that plaintiff suffered a fractured hip and that he focused his treatment on the complaints of knee pain and weakness. He stated that although plaintiff reported a history of a fall during the first office visit, one would not expect such event to result in a fractured hip based upon plaintiff's age and overall physical condition. He reiterated that her complaints and the physical examination findings both focused on the knee. In addition, Dr. Goitz testified that he could not identify a time frame for when the fracture occurred, only that the x-ray findings from September 2002 verified that this was a chronic condition.

{¶ 24} "In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things." *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, 131, paragraph 1 of the syllabus.

{¶ 25} Plaintiffs did not present expert testimony from a rheumatologist. Dr. Seigel, plaintiffs' expert, testified that he was an orthopedic surgeon and that although he had worked closely with rheumatologists during his years of practice he was not a rheumatologist nor did his training include a rheumatology residency. After discussion with the parties, the court overruled defendant's objection and permitted Dr. Seigel to offer an opinion about Dr. Kahaleh's care and treatment of plaintiff. Nonetheless, for the purposes of this decision, the court finds that Dr. Seigel's opinion regarding Dr. Kahaleh's treatment was of limited value and only relevant insofar as he addressed the standard of care applicable to all medical doctors regardless of any specialty.

{¶ 26} Dr. Seigel testified that in his opinion, Dr. Kahaleh's treatment of plaintiff fell below the standard of care for physicians when, during the February 5, 2002 office visit, he did not recognize that plaintiff's physical findings were indicative of hip pathology which was not consistent with the earlier diagnosis of trochanteric bursitis. Indeed, Dr. Seigel opined that the standard of care for physicians as diagnosticians required Dr. Kahaleh to re-evaluate plaintiff in light of the deterioration in her ability to ambulate, her reported poor performance at physical therapy, and the obvious weakness noted in her right hip.[5]

{¶ 27} Dr. Seigel opined that plaintiff's hip fracture occurred in October 2001, based upon his review of the medical records and taking into consideration plaintiff's complaint of hip pain at that time and despite the fact that her pain improved over the next few months. He explained that in all likelihood the formation of soft tissue scarring helped to support and stabilize the fracture and that the pain then escalated several months later as the scar tissue alone was unable to maintain stabilization of the fracture over such a prolonged period of time. He emphasized that plaintiff consistently complained of knee and hip pain. As additional support for his opinion as to the timing of the fracture, Dr. Seigel referenced the diagram completed by plaintiff at the outset of physical therapy which underscored plaintiff's subjective complaint of significant hip pain. (Joint Exhibit 1, Page 82.) Thus, he opined that a prolonged delay in diagnosis resulted in non-union of the fracture and the buildup of scar tissue, leading to a reduced chance of healing once surgical intervention commenced.

{¶ 28} Defendant's expert rheumatologist, Dr. Michael Colin, testified that Dr. Kahaleh's care and treatment of plaintiff as recorded met the standard of care with respect to every office visit. He noted that plaintiff had a long history of various aches and pains and that prior to September 5, 2002, Dr. Kahaleh's records do not reflect a specific incident or set of symptoms that would suggest that plaintiff was suffering from a hip fracture or that an x-ray of the hip was necessary. The court agrees. The court finds that based upon her own account in the June 2001 letter to Dr. Kahaleh and

---

[5]Dr. Seigel was also critical of Dr. Kahaleh's failure at the September 5, 2002 examination to note in the medical records the presence of any deformity or shortening of plaintiff's right leg. Although Dr. Seigel maintained that an abnormality would have been obvious and thus should have been recorded, the court places little weight on such opinion.

factoring in the July 2001 notes from the staff at the aquatic therapy center, that plaintiff exhibited a longstanding and persistent inability to tolerate exercise of any kind and that therefore, her failure to tolerate or to progress with physical therapy in December 2001 was not necessarily unusual. Further, plaintiff had relied on crutches to help with ambulation prior to the October 18, 2001 appointment. Finally, the court notes that Dr. Muschler's records verify that plaintiff showed clinical signs of trochanteric bursitis during his examination of her on September 16, 2002. (Joint Exhibit 1, Page 214.)[6]

{¶ 29} The court further finds plaintiff's testimony regarding her recollections of a fall at home prior to the October 18, 2001 appointment with Dr. Kahaleh was not credible. Indeed, even assuming that every event described by plaintiff as occurring in her home on October 18, 2001, actually occurred, the court finds that such events were not effectively communicated to Dr. Kahaleh on that date, or at any other appointment with him. Upon review of the evidence submitted, the court finds that plaintiff failed to prove that the care and treatment provided to her by Dr. Kahaleh fell below the standard of care.

{¶ 30} As for the care rendered by Dr. Goitz, Dr. Seigel opined that Dr. Goitz did not meet the standard of care when he failed to review the report of the physical therapist. Dr. Seigel testified that plaintiff underwent a comprehensive evaluation by the physical therapist a mere eight days after she was first seen by Dr. Goitz. According to that report, plaintiff exhibited multiple physical findings that in Dr. Seigel's opinion were highly suggestive that plaintiff's problems stemmed from the hip and not from the knee. (Joint Exhibit 1, Pages 79-82.) As such, Dr. Seigel opined that Dr. Goitz should have focused his December 31, 2001 examination on plaintiff's hip; and that plaintiff's inability to raise her leg off the exam table combined with the fact that she had been using crutches earlier but that she was again confined to a wheelchair should have alerted Dr. Goitz of the possible hip injury. According to Dr. Seigel, the pain from patellar tendonitis does not normally reach a level such that a patient would need crutches to ambulate, let alone would such a patient regress to the point of needing a wheelchair. Thus, Dr.

---

[6]As such, the court does not place much weight upon Dr. Seigel's testimony that Dr. Kahaleh improperly diagnosed plaintiff with trochanteric bursitis which opinion was based in part upon Dr. Seigel's interpretation of the significance of eliciting hip pain upon internal rotation versus external rotation of the affected extremity.

Seigel opined that plaintiff's failure to improve was an indication that Dr. Goitz should have reevaluated whether some other pathology accounted for her symptoms. Dr. Seigel opined that the standard of care required Dr. Goitz to re-examine the diagnosis of patellar tendonitis and investigate whether something was wrong with plaintiff's hip as well.

{¶ 31} Defendant's expert, Dr. Brodell, testified that he is board-certified in orthopedic surgery. He opined that the medical treatment provided to plaintiff by Dr. Goitz did not fall below the standard of care and that Dr. Goitz responded in accordance with the symptoms presented. Dr. Brodell explained that plaintiff presented a complicated clinical picture with various complaints of pain associated with her diagnosed conditions of trochanteric bursitis, fibromyalgia, and RA. In addition, he noted that plaintiff's reliance on prescribed daily doses of prednisone, a powerful anti-inflammatory medication, and narcotic analgesics, would tend to mask the severity of her pain and lead her to report a lesser amount of discomfort than that associated with a fracture.

{¶ 32} Dr. Brodell opined that based upon the medical records and plaintiff's subjective complaints, plaintiff developed a spontaneous stress fracture some months prior to September 5, 2002, that worsened over time. He described a stress fracture as a tiny microscopic crack in a portion of a person's bone that would gradually extend and widen such that eventually the edges become displaced. He based his opinion, in part upon the medical records which document that plaintiff's pain waxed and waned but that it became unbearable in September, symptoms consistent with the formation of a stress fracture.

{¶ 33} Dr. Brodell further opined that Dr. Goitz's treatment did not fall below the standard of care inasmuch as plaintiff's complaints focused on her right knee and not her hip during the examinations on November 21 and December 31, 2001. Indeed, Dr. Brodell noted that while the physical therapy notes document increased pain with all modalities attempted in therapy, such notes do not specify whether the increased pain was experienced at the knee or at the hip. Although Dr. Brodell admitted that the physical therapy objective findings suggest primary hip pathology, he opined that Dr. Goitz's care and treatment did not fall below the standard of care in that the findings

noted during the December 31, 2001 examination would not lead an orthopedic surgeon to suspect that plaintiff was suffering from a hip fracture.

{¶ 34} On cross-examination, Dr. Brodell clarified that the standard of care requires an orthopedic surgeon to take into account the information shared by the physical therapist. Nonetheless, he opined that Dr. Goitz's failure to review the physical therapy plan of care did not fall below the standard of care inasmuch as Dr. Goitz discussed with plaintiff her experiences at physical therapy during his December 31, 2001 examination.

{¶ 35} Dr. Brodell also opined that, during the April 24, 2002 examination, Dr. Goitz met the standard of care when he continued to focus on plaintiff's knee rather than her hip as the source of her pain. Dr. Brodell noted that plaintiff had minimized her complaints of hip pain by associating the pain with her RA and characterizing the quality of her pain as chronic.

{¶ 36} The court notes that the expert orthopedic surgeons who testified at trial disagreed about several key aspects of plaintiff's treatment and the signs and symptoms described in the medical records. For example, Dr. Seigel maintains that Dr. Goitz should have realized that plaintiff was suffering from hip pathology based upon the decreased hip flexor strength, the inability to bear weight without assistance from crutches and the gradual decline into use of a wheelchair. Dr. Seigel also relies on the physical therapy notes which suggest that plaintiff be evaluated for some other condition because she did not seem to be improving despite undergoing the prescribed exercises. In addition, the experts, including plaintiffs' expert radiologist, Dr. Herbst, also disagree whether the fracture could have started as a stress fracture that worsened over time versus a break that was directly attributable to an acute traumatic event. Dr. Brodell asserts that persons without weakened bone density can have a stress fracture and that plaintiff was a candidate for a stress fracture due to her obesity, history of smoking, and chronic steroid use. Dr. Brodell contends that even the September 16, 2002 Cleveland Clinic notes state that the x-rays brought in by plaintiff show "moderate osteopenia" a radiographic term for thinning of bone (Joint Exhibit 1, Page 214.) The experts all agree that the exact date that the fracture occurred cannot be determined based solely upon a

review of the x-ray findings; merely that the x-ray shows that the fracture was at least five to six months old or older when it was discovered on September 5, 2002.

{¶ 37} After careful consideration of all the testimony and evidence, the court finds that Dr. Goitz's treatment of plaintiff did not fall below the standard of care with respect to the November 21, 2001 office visit. The court relied, in part, upon plaintiff's testimony in finding that the fall she reported to Dr. Goitz was relatively insignificant. Further, based upon the history reported by plaintiff as reflected in the medical records along with both the significant complaints of pain and the corresponding clinical findings of pathology present in the knee, and without a verifiable incident of acute trauma,[7] the court finds that the manner of Dr. Goitz's treatment of plaintiff on December 31, 2001, did not fall below the standard of care. The court further finds that Dr. Goitz's care of plaintiff did not fall below the standard of care for orthopedic surgeons inasmuch as such standard does not require Dr. Goitz to review every physical therapy record. In addition, the court finds Dr. Brodell's opinion to be persuasive in that the information reported by the physical therapist was not inconsistent with plaintiff's previously diagnosed conditions.

{¶ 38} Finally, the court notes that Dr. Goitz documented the fact that plaintiff used a wheelchair prior to her initial consultation with him. Thus, the court finds that Dr. Goitz's treatment of plaintiff did not fall below the standard of care when he recommended that she undergo another course of physical therapy inasmuch as plaintiff's condition fluctuated between ambulating with crutches and resorting to a wheelchair, and that such conduct was not necessarily unusual for this patient.

{¶ 39} For the foregoing reasons, the court finds that plaintiffs failed to prove that the care and treatment provided to plaintiff either by Dr. Kahaleh or by Dr. Goitz fell below the standard of care. The court further finds that the loss of consortium claim is derivative of the central cause of action. Thus, the derivative claim fails as well. See *Breno v. City of Mentor,* Cuyahoga App. No. 81861, 2003-Ohio-4051. Accordingly, judgment shall be rendered in favor of defendant.

---

[7]The November 29, 2001 physical therapy plan of care includes the following notation: "[Plaintiff] complains of right sided knee pain. The pain has been present for approximately 1-½ months and it has gradually increased. The patient has a history of rheumatoid arthritis and fibromyalgia. She states that there was no specific injury associated with this pain." (Joint Exhibit 1, Page 79.)

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

MELINDA F. GERSCHUTZ, et al.

   Plaintiffs

   v.

MEDICAL COLLEGE OF OHIO HOSPITAL

   Defendant
   Case No. 2003-04783

Judge Joseph T. Clark

<u>JUDGMENT ENTRY</u>

This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of defendant. Court costs are assessed against plaintiffs. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

_____
JOSEPH T. CLARK

Judge

cc:

Anne B. Strait
Assistant Attorney General
150 East Gay Street, 18th Floor
Columbus, Ohio 43215-3130

Jonathan S. Tsilimos
Lawrence Landskroner
55 Public Square, Suite 1040
Cleveland, Ohio 44113-1904

SJM/cmd
Filed October 22, 2009
To S.C. reporter November 17, 2009